Filing # 69054723 E-Filed 03/09/2018 01:23:17 PM

IN THE CIRCUIT COURT, FOURTH
JUDIC\IAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2016-CA-002080-XXXX-MA
DIVISION: CV-E

**LYNETTE GRANCELLI,**

    Plaintiff,

v.

**ALLERGAN, INC.,**
**a foreign corporation,**
**ALLERGAN SALES, LLC,**
**a foreign limited liability company,** and
**ALLERGAN USA, INC.,**
**a foreign corporation,**

    Defendants.

_____/

<u>**COMPLAINT**</u>

The Plaintiff, **LYNETTE GRANCELLI,** sues the Defendants, **ALLERGAN, INC., a**

**foreign corporation, ALLERGAN SALES, LLC, a foreign limited liability company,** and

**ALLERGAN USA, INC., a foreign corporation,** and allege the following:

**GENERAL ALLEGATIONS**

    1.    This is an action for damages in excess of $15,000, exclusive of attorney's fees,

costs, and interest.

    2.    All conditions precedent to the filing of this action have been performed or have

occurred.

    3.    At all times material hereto, the Plaintiff, **LYNETTE GRANCELLI** (hereinafter

"Ms. Grancelli"), was and is a resident of, and permanently domiciled in, Duval County, Florida.

4.    All medical care and treatment rendered to Ms. Grancelli, upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

5.    The Defendant **ALLERGAN, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.    The Defendant **ALLERGAN, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.    The Defendant **ALLERGAN, INC.** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

8.    The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

9.    The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

10.    The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

11.    The Defendant **ALLERGAN USA, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

12.    The Defendant **ALLERGAN USA, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

13.    The Defendant **ALLERGAN USA, INC.** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

14.    The Defendants **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.** are hereinafter collectively referred to as "Allergan."

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

15.    In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants.  In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

16.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

17.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

18.     As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

19.     After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

20.     In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

21.     In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.

22.     On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

23.     In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment.  Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

24.     On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

25.     On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants. The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

26.     In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

27.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

5

28.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[1], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

### Loren Z. and Mark A. Clayman

29.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Loren Z. Clayman, M.D., PA (hereinafter "Clayman PA"), with himself listed as both President and the Registered Agent of the new corporation.

30.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice. During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

31.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[2]

---

[1]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.
[2]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

32.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan). The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

33.     Before Ms. Grancelli first consulted with Clayman PA regarding breast augmentation in August 2011, Loren Z. Clayman began making a higher than average number of warranty claims for patients with saline filled implants. In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself. Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients. This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Jenkins.

34.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

35.     After June 30, 2008, Loren Z. Clayman's son, Mark A. Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark A. Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him. Likewise, in many instances, Mark A. Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

36.    __Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.__

37.    According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

38.    Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.  In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

39.    Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

### LYNETTE GRANCELLI

40.    Ms. Lynette Grancelli initially sought consultation for surgery to her nose, and possibly breasts, from Mark A. Clayman's office on May 5, 2011.  The primary reason that the patient was there was to discuss a rhinoplasty and correct her deviated septum.  However, she also noted that she was there to discuss, "possible breast implants."  Mark A. Clayman assured her that he could perform the necessary nasal surgery to improve her breathing and to improve her appearance.  He then quickly turned his attention to Ms. Grancelli's breasts.  He assured her that he could provide her with the look she desired.  Mark A. Clayman explained to her that he would

put the implant in through her nipple and behind the muscle. In addition, he would suture it from the inside to give her an internal lift and provide the fullness she desired.

41.     During the initial consultation on May 5, 2011 Mark A. Claymen did not discuss in detail with Ms. Grancelli her objectives, the possible alternatives or the type or size of implants to be used. He failed to take a detailed physical examination, including dimensional assessment of Ms. Grancelli's breasts. Mark A. Clayman provided Ms. Grancelli with a separate surgery cost estimate form that indicated that he would perform an augmentation mammoplasty areola for $3,000 plus an operating room charge of $750.

42.     Unbeknownst to Ms. Grancelli, Loren Z. Clayman, Mark A. Clayman, and Clayman PA had a specific financial incentive to push saline implants on their patients, including Ms. Burrell, even when the patient specifically expressed a desire for silicone implants or was a good candidate for silicone implants. Loren Z. Clayman, Mark A. Clayman, and Clayman PA had engaged in a scheme with Allergan, the manufacturer of the saline implants, that they could claim a defect in the saline implants and replace them for their direct financial benefit when no such defect existed. Moreover, Loren Z. Clayman and/or Mark A. Clayman would claim defect of the saline implants and replace them in order to cover up his inadequate surgical skills or haste in performing surgeries on his patients.

43.     Ms. Lynette Grancelli returned for surgery on August 16, 2011 with the following complaints and goals:

- "nose – shaving bump, taking out membranes on right side of nose that give me sinus pressure"

- "Breasts – I am 38D that sags. I'd like fuller not so saggy boobs."

There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Grancelli's breasts nor any physical findings whatsoever. The History and Physical in Mark A. Clayman's chart does not contain any marks that purport to be that of Mark A. Clayman. There is, however, a notation that states: "38D → 38DD." This is despite the patient's specific request to remain a size D only to look "fuller." The single pre-operative photograph of Ms. Grancelli's breasts taken on August 16, 2011 is only a frontal view. In this photograph, however, she demonstrates breast ptosis (sagging) and fairly significant disorientation of the nipple areolar complexes.

44.    Ms. Lynette Grancelli underwent breast augmentation surgery by Mark A. Clayman on August 16, 2011. Mark A. Clayman cut into the intra-areolar area at the border and dissected down to the pectoralis muscle. Then, the muscle was purported elevated and released in an appropriate pocket developed. He then tightened the capsule. Mark A. Clayman inserted Allergen Natrelle style 68 High Profile 320cc saline implants. The amount of saline used to inflate the implants was not recorded. Rhinoplasty and turbinectomy were also performed.

45.    Ms. Grancelli returned for post-operative follow-up to Mark A. Clayman on August 18, 2011. She had the following questions:

- "when can I massage my implants."
- "what kind of lotion should I use?"
- "when can I workout again? (yoga)"
- "should I still be icing?"
- "when can I take stuffing out of nose."

There are no notations by either Mark A. Clayman or his staff of the patient's visit on August 18, 2011. Specifically, there is no indication of a physical examination or whether her questions were answered.

46.  Ms. Grancelli returned again on August 22, 2011. There is no record of the patient's subjective assessment. The note by Mark A. Clayman's staff was that, "Pt. seen post-op nasal surg & breasts. Looks good. B-12 given. R.T. O. Thursday." There is a separate, extremely brief note written by Mark A. Clayman that states "splint removed, instructions given, ret. Thursday for sutures." There is no description of the patient's condition.

47.  Ms. Lynette Grancelli returned again to Mark A. Clayman on August 25, 2011. There is no record of the patient's subjective assessment. The only notation for the visit, apparently by Mark A. Clayman, states that "airway open, swelling coming down, re-tape ret. 1 week for tape Δ." There was no mention of her breasts or recognition of any concern or problem.

48.  Ms. Lynette Grancelli did not return again until April 9, 2012. At that time she was concerned whether the existing scar tissue would ever fade. Mark A. Clayman made the following note: "Pt with some Δ's to right breast, drastic acne everywhere. Plan adjustment as pt has been doing a lot of pushups." There is no description of the alleged changes to her right breast, no specific reference of a physical examination, including dimensional assessment of Ms. Grancelli's breasts, and no plan of care. There is no indication that the options or alternatives for addressing her condition were discussed. Mark A. Clayman simply informed her that her right implant was defective or deflated. There is a separate surgery cost estimate form that indicates that a bilateral adjustment will be performed at no charge to the patient.

49.  Lynette Grancelli returned again on June 28, 2012 for her second breast surgery by Mark A. Clayman. The patient questionnaire for the day of surgery indicates Ms. Grancelli's belief

that her, "right breast implant slipped out from the muscle." She further indicated that she was there to fix her breast augmentation. There is no record that Mark A. Clayman discussed her specific goals or objectives prior to surgery. There is no indication that Mark A. Clayman provided appropriate counseling regarding the size or structure of her breasts, their asymmetry or position, or answered any of her questions or addressed her concerns.

50.    On June 28, 2012 Mark A. Clayman had Lynette Grancelli sign an Authorization for Consent to Surgery or Therapeutic Procedures indicating that Ms. Grancelli had a "possible right deflation" and that she required a bilateral replacement of her saline implants. However, Ms. Grancelli did not have a right implant deflation.

51.    There is no documented physical examination prior to the surgery of June 28, 2012, specifically no documented dimensional assessment of Ms. Grancelli's breasts and no physical findings whatsoever. The History and Physical form in Mark A. Clayman's chart does not contain any marks that appear to be those made by Mark A. Clayman.

52.    Mark A. Clayman listed a right deflation as his pre-operative diagnosis in both the Operative Report and OR Record of June 28, 2012. However, the pre-operative photograph in Mark A. Clayman's chart taken on the day of surgery does not demonstrate deflation of either implant but simply malposition and improper placement of the implants.

53.    On June 28, 2012 Mark A. Clayman first cut into the right breast at the border of the areola and dissected down to the implant. He recorded that the, "implant was found to have deflation (tissue/leak @ valve) and removed. Likewise, the OR Record indicated, "tissue & leak @ valve right." He then purported performed a right internal plication. He then cut into the left breast at the border of the areola and dissected down to the implant on the left. Although the left implant was found intact it was, nonetheless, removed. Mark A. Clayman replaced the previous

Allergen Natrelle style 68 High Profile 320cc implants with Allergen Natrelle style 68 Moderate Profile 360cc saline implants bilaterally. The amount of saline used to inflate the implants was not recorded. Anesthesia was administered by a registered nurse intravenously using the regimen of Demerol, Ativan, Ketamine, and Versed.

54.    Mark A. Clayman reported the right implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[1]  Mark A. Clayman had Lynette Grancelli sign the claim form before the surgery was performed, so that Mark A. Clayman could be paid. Mark A. Clayman subsequently filed a warranty claim to Allergan for the right implant that he removed on June 28, 2012. In the paperwork he completed and sent to Allergan, Mark A. Clayman reported that there was a "[h]ole in valve" and/or "[p]articles in valve." [2]    After examining the returned right implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Specifically, the Laboratory Analysis found,

> White particles were observed on the inner and outer surface of the implant. Brown particles were observed in in[sic] the fill channel. The particles were removed and valve functioning was then satisfactory. The analysis identified no openings in the implant.

Despite this, Allergan paid Mark A. Clayman and Clayman PA the sum of $1,200 for the surgery of June 28, 2012.

55.    Ms. Grancelli returned for post-operative follow-up on July 2, 2012. She had the following questions:

- "I took out my stiches because I was in so much pain."

---

[1] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was received in Mark A. Clayman's office via facsimile prior to surgery.
[2] These were the same defects Mark A. Clayman reported in virtually every warranty claim submitted to Allergan.

- "I would like a note stating how long I should have taken off work to heal b/c I'm having problems w/ my job & time off."

The only notation, apparently by Mark A. Clayman states, "ret. check, pt removed her own sutures 24 hours after surgery. Risk of infx discussed." There is no detailed description of a physical examination and no description of the condition of Ms. Grancelli's breast.

Ms. Grancelli returned to see Mark A. Clayman on July 6, 2012. There is no record of the patient's subjective assessment. The only note, apparently my Mark A. Clayman's staff was that, "B-12 & antibiotic shot. R.T.O. Mon." The author of the note is unknown but there is no indication of a physical examination by a physician or any description of the condition of Ms. Grancelli's.

56.    Ms. Grancelli returned to see Mark A. Clayman for the last time on July 30, 2012. She complaint that there was a, "stich is coming through skin." The only note was a very brief note by Mark A. Clayman that indicated, "deep suture spit on left, removed." There is no detailed of her condition and no indication regarding her breasts otherwise.

57.    After July 30, 2012, Lynette Grancelli left the care of Clayman Plastic Surgery and Clayman P.A. After two surgeries at the hands of Mark A. Clayman, Ms. Grancelli's implants were severely asymmetrical and caused her severe pain. She demonstrates a poor aesthetic appearance and has significant scarring and tissue damage. In addition, her breasts were far larger than she desired them to be, a DDD.

## COUNT I – CLAYMAN AND ALLERGAN'S CONSPIRACY TO COMMIT
## FRAUD AND/OR BREACH OF FIDUCIARY DUTY

58.     Ms. Grancelli re-alleges and incorporates by reference paragraphs 1 through 57.

59.     On or before May 5, 2011, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty. Later on, after Mark A. Clayman came to work at Clayman PA, he too entered into the agreement with Allergan to commit fraud and/or breach of fiduciary duty.

60.     Throughout the care and treatment of Ms. Grancelli, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA breached his/their fiduciary duty to Ms. Grancelli by:

(a).     Recommending or insisting on Allergan Natrelle saline implants based on his/their direct financial motivation rather than making appropriate recommendations based on the best interest of the patient;

(b).     In relation to the June 28, 2012 surgery, claiming that Ms. Grancelli's breast implant had deflated when in fact it had not;

(c).     Operating on Ms. Grancelli based on an alleged implant deflations/ruptures, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedure that was previously performed;

(d).     Not performing the surgeries that Ms. Grancelli's physical condition actually required, in favor of surgeries that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants; and/or

(e).     Repeatedly operating on Ms. Grancelli for alleged implant deflations so that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA could recover surgical fees from Allergan.

15

61.    On one or more of the below occasions, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA made the following false statements or representations, which were intended to conceal his/their inability to perform the breast procedures competently and within the standard of care, and were also intended to conceal his/their financial motivation in connection with removal and replacement of Allergan Natrelle saline implants, and these statements did in fact mislead Ms. Grancelli and/or caused her to respond in the following ways to her detriment:

(a).    On or about April 9, 2012, at Clayman PA's office, Mark A. Clayman told Ms. Grancelli that her right breast implant had a leak, rupture, and/or deflation and that she needed to have it replaced. These statements were false, but they caused Ms. Grancelli to agree to have another surgery by Mark A. Clayman and/or Clayman PA, to not seek a second opinion with another plastic surgeon, and/or to not consult with an attorney about a potential medical negligence claim;

(b).    In a surgical estimate prepared on April 9, 2012, at Clayman PA's office, Mark A. Clayman represented to Ms. Grancelli that she required a "bilateral adjustment" presumably due to her right breast implant being deflated and needed to be replaced. In fact, Ms. Grancelli did not have a right implant deflation, rupture, or leak, and Ms. Grancelli did not need to have her implant(s) replaced. These statements were false, but they caused Ms. Grancelli to agree to have another surgery by Mark A. Clayman and/or Clayman, PA, and not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(c).    In the informed consent dated June 28, 2012, Mark A. Clayman represented to Ms. Grancelli that her right breast implant was deflated and needed to be replaced. In fact, Ms. Grancelli did not have a deflation, rupture, or leak of her right implant, and Ms.

Grancelli did not need to have her implant(s) replaced. These statements were false, but they caused her to agree to have another surgery by Mark A. Clayman and/or Clayman, PA instead of a different plastic surgeon. As a result, Ms. Grancelli did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(d).    In the Operative Report and OR Record dated June 28, 2012, Mark A. Clayman represented to Ms. Grancelli that her right breast implant was deflated and needed to be replaced. In fact, Ms. Grancelli did not have a deflation, rupture, or leak of her right implant, and Ms. Grancelli did not need to have her implant(s) replaced. These statements were false, but they caused her to agree to have another surgery by Mark A. Clayman instead of a different plastic surgeon. As a result, Ms. Grancelli did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e).    On or about June 28, 2012, at Clayman PA, Mark A. Clayman and/or Clayman PA made a warranty claim to Allergan in which he represented to Allergan, Ms. Grancelli, and/or others that she had a leak, rupture, and/or deflation at her right breast implant, and that she needed to have it replaced as a result. These statements were false, but they caused Ms. Grancelli to agree to have another surgery by Mark A. Clayman and/or Clayman P.A., to not seek a second opinion with another plastic surgeon, and/or to not consult with an attorney about a potential medical negligence claim.

62.    Allergan, through its employees or agents, knew that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, was committing fraud upon Ms. Grancelli, and/or breaching a fiduciary duty owed to Ms. Grancelli, due to the following:

17

(a).    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants;

(b).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants;

(c).    Allergan did not have a Laboratory Analysis that supported paying the warranty claim of Mark A. Clayman and/or Clayman PA in relation to the right breast implant removed by Mark A. Clayman and/or Clayman PA from Ms. Grancelli on June 28, 2012;

(d).    Allergan's Laboratory Analysis of the right breast implant removed by Mark A. Clayman and/or Clayman PA on June 28, 2012, was unable to identify a "source for the alleged deflation" at the right breast implant; specifically, there were "no openings in the implant" shell, and "[v]alve functioning was satisfactory," and hence, there was no evidence to support Loren Z. Clayman's/Clayman P.A.'s claim of a rupture or deflation.

63.    Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants until May 5, 2011;

(b).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities before May 5, 2011;

(c).    Paying the warranty claim of Mark A. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right saline filled breast implant that Mark A. Clayman placed into Ms. Grancelli on August 16, 2011, and which Mark A. Clayman surgically removed on June 28, 2012;

(d).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants after May 5, 2011;

(e).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after May 5, 2011.

64.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Grancelli suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

65.    Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Grancelli has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **LYNETTE GRANCELLI**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN**

**USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

66.    Ms. Grancelli re-alleges and incorporates by reference paragraphs 1 through 57, 60, and 61.

67.    Allergan, through its employees or agents, knew that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, was committing fraud upon Ms. Grancelli, and/or breaching a fiduciary duty owed to Ms. Grancelli, due to the following:

(a).    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants;

(b).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants;

(c).    Allergan did not have a Laboratory Analysis that supported paying the warranty claim of Mark A. Clayman and/or Clayman PA in relation to the right breast implant removed by Mark A. Clayman and/or Clayman PA from Ms. Grancelli on June 28, 2012;

(d).    Allergan's Laboratory Analysis of the right breast implant removed by Mark A. Clayman and/or Clayman PA on June 28, 2012, was unable to identify a "source

for the alleged deflation" at the right breast implant; specifically, there were "no openings in the implant" shell, and "[v]alve functioning was satisfactory," and hence, there was no evidence to support Loren Z. Clayman's/Clayman P.A.'s claim of a rupture or deflation..

68.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA in committing fraud against Ms. Grancelli, and/or breaching a fiduciary duty owed to Ms. Grancelli, in one or more of the following ways:

(a).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants until May 5, 2011;

(b).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities before May 5, 2011;

(c).    Paying the warranty claim of Mark A. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right saline filled breast implant that Mark A. Clayman placed into Ms. Grancelli on August 16, 2011, and which Mark A. Clayman surgically removed on June 28, 2011;

(d).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants after May 5, 2011;

(e).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after May 5, 2011.

69.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Grancelli suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization,

medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

70.     Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Grancelli has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **LYNETTE GRANCELLI**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

71.     Ms. Grancelli re-alleges and incorporates by reference paragraphs 1 through 57.

72.     Allergan, and or its predecessors in interest, designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants: right and left Natrelle Style 68 High Profile 320 cc saline filled implants with serial numbers 16852283 and 16788620, that were implanted by Mark A. Clayman on August 16, 2011, and which were surgically removed by Mark A. Clayman on June 28, 2012; right and left Natrelle Style 68 Moderate Profile saline filled implants with serial numbers 16966447 and 17111245 that were implanted by Mark A. Clayman on June 28, 2012 and remain inside her body.

73.     At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and both sets did in fact reach, consumers in the State of Florida, including Ms. Grancelli, without substantial changes in the condition in which they were sold or distributed.

74.     At all times material, one or more of the aforesaid saline filled breast implants were being used in the manner intended, or based upon all of the circumstances, reasonably expected, by Allergan.

75.     At all times material, one or more of the aforesaid saline filled breast implants were in fact defective and in an unreasonably dangerous condition at the time they were placed into the stream of commerce, and when put to their reasonably anticipated use, in one or more of the following ways:

a.     Design

(1).     One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).     One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).     Prior to the time that the implants identified above were sold, distributed, and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

23

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

76.    The defective condition of one or both of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which exceeded the benefits of the products, and for which safer products were available.  This defective condition

24

made one or both pairs of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

77.    The defective condition of one or both of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Grancelli to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **LYNETTE GRANCELLI**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT IV – ALLERGAN'S PRODUCT NEGLIGENCE

78.    Ms. Grancelli re-alleges and incorporates by reference paragraphs 1 through 57.

79.    Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  right and left Natrelle Style 68 High Profile 320 cc saline filled implants with serial numbers 16852283 and 16788620, that were implanted by Mark A. Clayman on August 16, 2011, and which were surgically removed by Mark A. Clayman on June 28, 2012; right and left Natrelle Style 68 Moderate Profile saline filled implants with serial numbers 16966447 and 17111245 that were implanted by Mark A. Clayman on June 28, 2012 and remain inside her body.

80.     Accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

(a).     to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

(b).     to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

(c).     to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

81.     On or before December 4, 2004, Allergan (and its predecessors in interest) knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

82.     Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.    Design

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to the time that the implants identified above were sold, distributed and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or both of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

83.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. Grancelli, directly caused or contributed to cause Ms. Grancelli to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **LYNETTE GRANCELLI**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:      (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff